IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| LES GOODWIN and MARY LOU GOODWIN,<br><br>    Plaintiffs,<br><br><br><br><br><br>vs.<br><br><br><br>HOLE NO. 4, LLC; PRUDENTIAL UTAH REAL ESTATE<br><br>    Defendants. | ORDER GRANTING IN PART AND DENYING IN PART HOLE NO. 4'S MOTION TO DISMISS, DENYING PRUDENTIAL'S MOTION TO DISMISS, AND DENYING PRUDENTIAL'S MOTION FOR A MORE DEFINITE STATEMENT<br><br><br><br><br><br>Case No. 2:06-cv-00679 |

The plaintiffs in this case, Les Goodwin and Mary Lou Goodwin, filed various claims against the defendants, Hole No. 4, LLC, and Prudential Utah Real Estate, relating to a residential real estate transaction. Specifically, the Goodwins allege Hole No. 4 breached a real estate purchase contract and the implied covenant of good faith and fair dealing. Further, the Goodwins allege both Hole No. 4 and Prudential committed the tort of negligent misrepresentation and violated the Utah Consumer Sales Practices Act. The Goodwins have asked for damages and for declaratory relief. Hole No. 4 and Prudential have moved to dismiss

all claims against them pursuant to Rule 12(b)(6), alleging the Goodwins failed "to state a claim upon which relief can be granted."[1] Prudential also requested this court to order the Goodwins to provide a more definite statement regarding the Goodwins' claims against it. The court finds a hearing on these motions to be unnecessary and concludes Goodwins' claim of negligent misrepresentation against Hole No. 4 fails under Rule 12(b)(6), but the remainder of the claims survive the defendants' motions.

## BACKGROUND

Hole No. 4 is the developer of Turnberry Woods, a forty-acre, planned, single-family development along the fourth hole of the Homestead Golf Course in Midway, Utah. Prudential is a real estate firm representing Hole No. 4 in the marketing and brokering of the Turnberry Woods units. In October 2004, Hole No. 4 and the Goodwins entered a reservation agreement, pursuant to which the Goodwins deposited $5,000 in earnest money to reserve the opportunity to buy a single-family unit within Turnberry Woods. This agreement was non-binding and contained language indicating it would be superceded and replaced by a Real Estate Purchase Contract (REPC).

The parties executed a REPC with regard to unit 12 of Turnberry Woods in May 2005. In this transaction, Prudential represented Hole No. 4 as its real estate agent and Coldwell Banker represented the Goodwins. The parties agreed to a purchase price of $395,000 in the REPC, and the Goodwins made an additional earnest money deposit of $20,000, pursuant to the agreement (for a total deposit of $25,000). The REPC outlined detailed processes for Hole No. 4 and the

---

[1] Fed. R. Civ. P. 12(b)(6).

Goodwins to formally agree on the final plans and specifications for unit 12. A letter accompanied the REPC, representing that by signing and returning the REPC, the Goodwins would "lock in" a below-market price of $395,000 for unit 12.

Notably, at the top of the first page of the REPC, in bold type, was printed "Utah law requires real estate licensees to use this form."[2] However, the Goodwins allege this form was not the State-approved form. Although similar, the form had been altered to benefit Hole No. 4 by limiting the legal remedies available to the Goodwins while preserving all of Hole No. 4's legal remedies. Instead of allowing the buyer to pursue any remedies available at law in the event of seller default, it limited the buyer to a return of the buyer's deposits and ten percent interest on the deposits. Specifically, it stated:

> If Buyer defaults, Seller may elect either to retain the Earnest Money Deposit(s) and Options & Extras Deposits, if any, as liquidated damages, or to return the Earnest Money Deposits and Options & Extras Deposits, if any, and sue Buyer to specifically enforce this Contract, or pursue other remedies available at law. If Seller defaults, Buyer agrees that Buyer's sole and exclusive remedy shall be to receive a return of Buyer's Earnest Money Deposits, the Options & Extras Deposit(s), if any, plus 10% interest thereon from the date of original deposit with Seller.[3]

As the development of Turnberry Woods progressed, more parties entered into REPCs for the purchase of units, and the value of the property increased. By July 2006 (a month before the Goodwins' property was to be completed), Hole No. 4 advertised its prices to prospective buyers as "[f]rom the $700,000's."[4]

---

[2] Compl. 3, ¶ 13, Docket No. 1.

[3] *Id.* at Ex. 1, ¶ 16.

[4] *Id.* at 4.

In a letter dated October 6, 2005, Hole No. 4 informed the Goodwins it would not fulfill its obligations under the REPC. Hole No. 4 sent the Goodwins a check for $25,876.36, declared itself to be in default, and asserted that the Goodwins had no remedy available to them other than to accept the deposit plus interest. However, unit 12 has been framed and continues to be constructed. In response to the Goodwins' later attempts to have Hole No. 4 sell them the property under the REPC, Hole No. 4 "stated it construes Paragraph 16 of the Prudential REPC to afford it the option to terminate the REPC for any reason upon tender to the 'Buyer' of a return of all deposits plus interest thereon at the rate of ten percent per annum . . . ."[5] As a result, the Goodwins brought this action alleging breach of contract, breach of the covenant of good faith and fair dealing, negligent misrepresentation, violation of the Utah Consumer Sales Practices Act[6] (UCSPA), and requesting damages and declaratory relief.

## DISCUSSION

**I.   Motions to Dismiss**

Hole No. 4 seeks dismissal of the Goodwins' contract and bad faith claims, citing the language of paragraph 16 as a limitation on the Goodwins' legal remedies. The Goodwins' misrepresentation claim should be dismissed, Hole 4 argues, on the basis of the economic-loss doctrine. Prudential argues the negligent misrepresentation claim was insufficiently plead. And according to Hole No. 4, the Goodwins' claim under the UCSPA fails because the Goodwins have not plead deceptive practices with sufficient specificity and have not stated facts supporting

---

[5] *Id.* at 5.

[6] Utah Code Ann. §§ 13-11-1 *et seq.*

a finding of unconscionability — Prudential makes the same basic arguments. The court addresses these claims, in turn.

    *(A)    Standard of Review*

The court should grant a Rule 12(b)(6) dismissal "'only when it appears that the plaintiff can prove no set of facts in support of the claims that would entitle him to relief, accepting the well-pleaded allegations in the complaint as true and construing them in the light most favorable to the plaintiff.'"[7] "[A]ll inferences that can be drawn from the allegations must be drawn in favor of the plaintiff."[8] When considering a Rule 12(b)(6) motion, the "'court's function . . . is not to weigh potential evidence that the parties might present at trial, but to assess whether the plaintiff's complaint alone is legally sufficient to state a claim for which relief can be granted.'"[9]

    *(B)    Breach of Contract Claim Against Hole No. 4*

In their complaint, the Goodwins allege Hole No. 4 anticipatorily repudiated the REPC. According to Hole No. 4, this breach of contract claim fails because the Goodwins received exactly what they bargained for — the return of their deposits, plus interest. But despite this dubious argument, Hole No. 4 has not shown the Goodwins are unable to prove any set of facts entitling them to relief for breach of contract.

In contract interpretation, the court must first look to the whole contract to discern the

---

[7] *Dubbs v. Head Start, Inc.*, 336 F.3d 1194, 1201 (10th Cir. 2003) (quoting *Yoder v. Honeywell, Inc.*, 104 F.3d 1215, 1224 (10th Cir. 1997)).

[8] *Iadanza v. Mather*, 826 F. Supp. 1371, 1376 (D. Utah 1993).

[9] *Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999) (quoting *Miller v. Glanz*, 948 F.2d 1562, 1565 (10th Cir. 1991)).

parties' intentions.[10] Hole No. 4 would have the court look only to paragraph 16, but the court must view this paragraph in relation to the contract as a whole, "with a view toward giving effect to all [provisions] and ignoring none."[11] If there is any doubt about a contract's interpretation, courts prefer interpretations leading to "fair and equitable" results over "harsh and unreasonable" results.[12] And Utah "courts endeavor to construe contracts so as not to grant one of the parties an absolute and arbitrary right to terminate a contract."[13] Finally, courts look to the circumstances, nature, and purpose of a contract in order to interpret the contract "in light of the reasonable expectations of the parties."[14]

In *Pierce v. Pierce*, the Utah Supreme Court rejected a lower court's reading of a contract, finding the court should have implied a term to prevent a harsh result and to honor the parties' intentions. The plaintiff and the deceased had entered into a contract whereby the plaintiff gave the deceased the majority of her paychecks, and the deceased promised to leave his estate to the plaintiff.[15] Just prior to his death, the deceased transferred a substantial portion of his property from his estate without the plaintiff's consent.[16] The Utah Supreme Court found the

---

[10] *State v. Ison*, 2006 UT 26, ¶ 46, 135 P.3d 864, 873.

[11] *WebBank v. Am. Gen. Annuity Svc. Corp.*, 2002 UT 88, ¶ 18, 54 P.3d 1139, 1145.

[12] *Pierce v. Pierce*, 2000 UT 7, ¶ 19, 994 P.2d 193, 198.

[13] *Id.* (citation and internal quotations omitted).

[14] *Id.* (citations omitted).

[15] *Id.* ¶ 3.

[16] *Id.* ¶ 4 & n.2.

parties' agreement included an implied term restricting transfers without the plaintiff's consent, even though the contract contained no such term expressly. The court reached this result even though the plaintiff had received a portion of the decedent's estate, so she had received some benefit of the bargain. The court determined that without the implied term, the decedent's promise may be illusory, allowing him to "arbitrarily avoid performance of his side of the bargain."[17] In sum, the court read an implied term into the contract in order to preserve its overall purpose and to prevent one party from having the right to arbitrarily terminate it.

In their complaint, the Goodwins allege Hole No. 4 told them it construed paragraph 16 of the REPC as affording it the option to completely avoid performance of its side of the bargain by simply paying the Goodwins' deposits back plus interest — this power to terminate was not limited to the occurrence of some event like the Goodwins' failure to pay or Hole No. 4's inability to finish the job. However, reading the REPC in this manner defeats the apparent purpose of the REPC. The purpose of this contract, consistent with its title, is to facilitate the transfer of real estate in exchange for money. The main provisions of the REPC contemplate that the Goodwins will purchase unit 12 of Turnberry Woods, upon its completion, in exchange for $395,000. Consequently, as in *Pierce*, to preserve the overall purpose of the contract (thus, the intent of the parties) it's reasonable to construe the contract as including an implied term limiting the effect of paragraph 16 to unintentional defaults.

In essence, construing paragraph 16 as giving Hole No. 4 an absolute and unconditional power to terminate the contract at any time either creates an option contract in favor of Hole No.

---

[17] *Id.* ¶ 27.

4, or creates a loan of $25,000 from the Goodwins to Hole No. 4, at a ten percent interest rate. The court does not see either of these results as being intended by the parties upon entering the REPC. In practical effect, an unlimited right to terminate would allow Hole No. 4 to construct its units, then either require the purchaser to buy the property as required in the contract or return the purchaser's deposit and sell the units to another. Under this rationale — after the Goodwins and Hole No. 4 worked through the entire construction process together and the Goodwins sold their current residence in anticipation of moving— Hole No. 4 could terminate the contract and sell to another purchaser for a higher price. On the other hand, if unit 12 were only worth $100,000 upon completion, the Goodwins would still be required to purchase it for $395,000. This would create an "option to sell" inconsistent with the other provisions of the contract. It effectively would give Hole No. 4 the right to define the nature and extent of its performance, a result which would make its promise illusory.[18]

Additionally, the court cannot see that it was the Goodwins' intent to make a loan of $25,000 to Hole No. 4 in order to receive a ten percent return. The title of the document alone belies this intent, as does the Goodwins' refusal to negotiate the $25,876.36 check Hole No. 4 issued after its breach. The letter the Goodwins allege Hole No. 4 sent in conjunction with the REPC further belies such a purpose. The letter indicated that by signing and returning the REPC, the Goodwins would "lock in" a price of $395,000 for the unit 12. Although this letter is not subsumed within the contract, the court must consider such evidence at this stage in the case

---

[18] *See Resource Mgmt Co. v. Weston Ranch & Livestock Co.*, 706 P.2d 1028, 1038 (Utah 1985); *see also Pierce*, 2000 UT 7, ¶ 27.

because "[r]ational interpretation requires at least a preliminary consideration of all credible evidence offered to prove the intention of the parties . . . so that the court can 'place itself in the same situation in which the parties found themselves at the time of contracting.'"[19]  Further, in Utah, there is at least some support for the notion that "[d]ocuments that are part of the same real estate transaction and are rendered 'substantially contemporaneously and are clearly interrelated' . . . must be construed as a whole and harmonized, if possible."[20]

In sum, it would be consistent with the purpose of the contract as a whole, as in *Pierce*, to limit the effect of paragraph 16 to unintentional defaults.  Further, it would avoid what would otherwise be a "harsh and unreasonable"[21] result.  Ultimately, because the Goodwins may be able to prove a set of facts entitling them to relief for breach of contract, the court does not dismiss this claim.

> (C)   *Breach of Implied Covenant of Good Faith and Fair Dealing Claim Against Hole No. 4*

As with the breach of contract claim, the Goodwins may be able to prove Hole No. 4 violated its implied covenant of good faith and fair dealing.  Under Utah law, "the implied covenant of good faith and fair dealing inheres in most, if not all, contractual relationships."[22] "[A]n implied covenant of good faith forbids arbitrary action by one party that disadvantages the

---

[19] *Ward v. Intermountain Farmers Ass'n*, 907 P.2d 264, 268 (Utah 1995).

[20] *Iadanza*, 826 F. Supp. at 1386 (quoting *Verhoef v. Aston*, 740 P.2d 1342, 1344 (Utah Ct. App. 1987)).

[21] *Pierce*, 2000 UT 7, ¶ 19.

[22] *A.I. Transp. v. Imperial Premium Fin.*, 862 F. Supp. 345, 348 (D. Utah 1994).

other."[23]

> An examination of express contract terms alone is insufficient to determine whether there has been a breach of the implied covenant of good faith and fair dealing. To comply with his obligation to perform a contract in good faith, *a party's actions must be consistent with the agreed common purpose and the justified expectations of the other party.* The purpose, intentions, and expectations of the parties should be determined by considering *the contract language and the course of dealings between and conduct of the parties.*[24]

Accordingly, the parties' common purpose and justified expectations are critical in deciding whether a party breached the implied covenant of good faith and fair dealing.[25]

The Goodwins allege the REPC was for the agreed common purpose of exchanging real estate for money. In light of this, the justified expectations of the Goodwins were to pay $395,000, pursuant to the terms of the contract, and to receive unit 12 of Turnberry Woods. Hole No. 4's treatment of paragraph 16 as an escape valve and its flat refusal to perform its contractual obligations directly frustrated this common purpose as well as the Goodwins' justified expectations.

Hole No. 4 relies heavily on *Oakwood Village LLC v. Albertsons, Inc.*,[26] to argue against this claim. However, this reliance is somewhat misplaced. In *Albertsons*, the court was faced with a different factual scenario — Albertsons, a tenant of Oakwood Village, moved out of the

---

[23] *Resource Mgmt Co.*, 706 P.2d at 1037.

[24] *St. Benedict's Devel. Co. v. St. Benedict's Hospital*, 811 P.2d 194, 200 (Utah 1991) (emphasis added).

[25] *A.I. Transp.*, 862 F. Supp. at 348.

[26] 2004 UT 101, 104 P.3d 1226.

building it leased but still paid rent on building.[27]  The Utah Supreme Court determined Albertsons still adequately performed under the contract — it acted consistently with the contract and with the parties' intentions.[28]  The court found the contract contained no express or implied provisions indicating Albertsons had a legal duty to operate a store in the leased premises.[29]  In contrast to *Albertsons*, this case involves an admitted default by Hole No. 4, and Hole No. 4's claim that the contract allowed it to unilaterally terminate the contract at any time.

The Goodwins have made sufficient claims Hole No. 4 acted inconsistently with the parties' intentions and the agreed-upon purpose of the REPC to sustain a claim of a breach of the implied covenant of good faith and fair dealing.

   (D)   *Negligent Misrepresentation Claims Against Prudential and Hole No. 4*

As the basis for their negligent misrepresentation claims, the Goodwins allege Hole No. 4 and Prudential represented the REPC as a form the State of Utah required all Utah real estate agents to use, yet the form had been altered to be more favorable to the sellers by limiting the buyers' remedies at law.  Additionally, the Goodwins allege Hole No. 4 and Prudential told them the Goodwins would "lock in" a price for unit 12 by executing and returning the REPC — a statement they later contradicted by repudiating the contract.  While the Goodwins' claim of negligent misrepresentation against Prudential stands, this claim against Hole No. 4 is barred by the economic-loss rule.

---

[27] *Id.* ¶¶ 4–6.

[28] *Id.* ¶ 20.

[29] *Id.* ¶ 26.

       1.    Prudential

With regard to the Goodwins' claim against Prudential, under the theory of negligent misrepresentation,

> a party injured by reasonable reliance upon a second party's careless or negligent misrepresentation of a material fact may recover damages resulting from that injury when the second party had a pecuniary interest in the transaction, was in a superior position to know the material facts, and should have reasonably foreseen that the injured party was likely to rely upon the fact.[30]

The Utah Supreme Court has recognized a duty of brokers and agents to "deal fairly and honestly, despite the fact that the broker is acting primarily as the seller's agent."[31]  Accordingly, even as the real estate broker and agent of the seller, Prudential owed a duty to the buyer — the Goodwins.

Because Prudential owed a duty to the Goodwins to deal honestly and fairly with them, the Goodwins were entitled to rely upon the information Prudential provided, and their reliance on this information was reasonable.  Prudential represented the REPC as the mandatory form in Utah when, in fact, it had been altered to diminish the Goodwins' rights at law.  Prudential argues the Goodwins' claim fails because the Goodwins failed to establish the representations Prudential made about the REPC form were false — in support of this premise, Prudential points to a Utah rule allowing brokers to use forms "in addition to the standard state-approved forms" if necessary.[32]  However, this rule does not allow brokers to use forms in lieu of state-approved

---

[30] *Price-Orem Investment Co. v. Rollins, Brown & Gunnell, Inc.*, 713 P.2d 55, 59 (Utah 1986).

[31] *Albertsons*, 2004 UT 101, ¶ 20 (quotations and citations omitted).

[32] Utah Admin. Code R. 162-6.2.1.1.

forms altogether. And this rule is largely irrelevant here because the core problem is that Prudential represented a modified form as being the state-approved form, not that it used forms in addition to the state-approved form. By relying on Prudential's representation, the Goodwins signed a form more favorable to the sellers than the actual state-approved form. Hole No. 4 terminated the contract pursuant to this seller-protective form. As this misrepresentation goes to the parties' substantive rights under the contract, it relates to a material fact.

Similarly, the representation that by returning the REPC, the Goodwins would "lock in" a price of $395,000 was false. As interpreted by Hole No. 4, paragraph 16 allowed Hole No. 4 to unilaterally terminate the contract at any time — a price cannot be locked in if one party has a right to terminate the contract. Because of Prudential's duty to deal honestly and fairly with the Goodwins, the Goodwins' reliance on this representation was reasonable. This "lock in" letter led the Goodwins to interpret paragraph 16 as damage provision taking effect if the parties unintentionally defaulted on the contract, not as a grant to Hole No. 4 of the right to terminate the contract for any reason. This misrepresentation relates to a material fact — the price guarantee for unit 12.

The Goodwins' negligent misrepresentation claim further survives Prudential's motion because, as the broker of Hole No. 4, Prudential had a pecuniary interest in the transaction. Additionally, it was in a superior position to know the material facts. As a Utah real estate broker, Prudential would know, better than the Goodwins (consumers from California), that the REPC it sent was not the form required by Utah law. Prudential was also in a superior position to know that, contrary to the representation in the letter, returning the REPC would not lock in a

price for unit 12.  Finally, these facts, as alleged by the Goodwins, are sufficient to show Prudential should have reasonably foreseen the Goodwins' reliance on its representations.

### 2.     Hole No. 4

Although the Goodwins' negligent misrepresentation claim survives as applied to Prudential, because the Goodwins suffered only economic loss from the breach of contract in the absence of an independent duty of care by Hole No. 4, the economic-loss rule bars this claim against Hole No. 4.  Under Utah's economic-loss rule, "a party suffering only economic loss from the breach of an express or implied contractual duty may not assert a tort claim for such a breach absent an independent duty of care under tort law."[33]  The court must first inquire if a duty exists independent of any contractual obligations between the parties.[34]

The Goodwins make much of the duty owed by real estate brokers and agents to prospective buyers.  Although the Utah Supreme Court has recognized a duty of brokers and agents to "deal fairly and honestly, despite the fact that the broker is acting primarily as the seller's agent,"[35] Hole No. 4 is neither a real estate broker nor an agent.  It is a real estate developer and seller.  The Goodwins summarily conclude the duties of real estate agents and brokers apply to sellers of real property also: "the economic-loss rule finds no application to claims of misrepresentation against Hole 4 as a seller of real property, whether on its own

---

[33] *Hermansen v. Tasulis*, 2002 UT 52, ¶ 13, 48 P.3d 235, 240.

[34] *Id.* ¶ 17.

[35] *Id.* ¶ 20 (quotations and citations omitted).

account or through its real estate agents."[36]  But the Goodwins point to no law to support this jump in logic.  In fact, Utah courts have recognized no independent duty of real estate sellers toward purchasers.[37]  Consequently, while Prudential may have owed an independent duty to the Goodwins, Hole No. 4 owed no such duty.

Because the Goodwins suffered only economic loss from breach of contract in the absence of an independent duty of care under tort law, the economic-loss rule bars the Goodwins' negligent misrepresentation claim against Hole No. 4.  The court dismisses this particular claim against Hole No. without prejudice, as this claim is connected with the contract claim.

    (E)    *Utah Consumer Sales Practices Act Claim*

Hole No. 4 argues the Goodwins' claims under the UCSPA fail because the Goodwins neglected to establish that the UCSPA applies to Hole No. 4 and the transaction in question and the Goodwins failed to plead their claim of deception with particularity.  Allegations of deception under the UCSPA fall within Rule 9(b)'s requirement of pleading with particularity,[38] and Hole No. 4 claims the Goodwins failed to meet this requirement.  Prudential argues this claim fails because Goodwins failed to designate which provision of the UCSPA Prudential violated.

The court finds the Goodwins' allegations legally sufficient to state a claim of unconscionable business practices under the UCSPA against both Hole No. 4 and Prudential. The UCSPA applies to the sales transaction at issue.  It prohibits a "supplier" from "knowingly

---

[36] Pls.' Mem. in Opp'n to Mot. to Dismiss 3, Docket No. 14.

[37] *See Diversified Holdings, L.C. v. Turner*, 2002 UT 129, ¶ 23, 63 P.3d 686, 697.

[38] *Jackson v. Philip Morris, Inc.*, 46 F. Supp. 2d 1217, 1222 (D. Utah 1998).

or intentionally" committing a deceptive or unconscionable act or practice in connection with a "consumer transaction."[39] The Goodwins, by alleging Prudential is a broker of residential real estate transactions and Hole No. 4 is a seller, adequately claimed both defendants were suppliers as defined by the UCSPA. And although Hole No. 4 argues otherwise, a "consumer transaction" under the UCSPA includes sales of residential real property.[40]

With regard to unconscionability, the UCSPA specifically provides that "[i]f it is claimed or appears to the court that an act or practice may be unconscionable, the parties shall be given a reasonable opportunity to present evidence as to its setting, purpose, and effect . . . ."[41] A contract clause may be unconscionable if it is substantively unconscionable, procedurally unconscionable, or both.[42] The focus of substantive unconscionability is the fairness of each parties' obligations.[43] Substantive unconscionability is indicated by "contract terms so one-sided as to oppress or unfairly surprise an innocent party,"[44] and is assessed "in light of the general commercial background" and "according to the mores and business practices of the time and place."[45]

---

[39] *See* Utah Code Ann. §§ 13-11-4, -5.

[40] *Iadanza*, 820 F. Supp. at 1377.

[41] Utah Code Ann. § 13-5-11(2).

[42] *Resource Mgmt Co.*, 706 P.2d at 1043.

[43] *Id.* at 1041.

[44] *Id.*

[45] *Id.* at 1042.

If read so as to allow Hole No. 4 the right not to sell the property by the mere expedient of returning the deposit (with interest), paragraph 16 could be substantively unconscionable — it would impose a duty on the Goodwins without ensuring they would benefit from the bargain. Moreover, paragraph 16 appears to differ greatly from standard business practices in Utah residential real estate.  For instance, according to the Goodwins, the State-sanctioned REPC retains the buyers' right to seek remedies for breach under the law.  It does not provide the seller with a unilateral right to terminate the contract for any reason.  Even the Utah Supreme Court has recognized "standard real estate contracts . . . typically do not contain cancellation provisions."[46]  Instead, such contracts "indicate[] that the obligations of the contract are binding on both parties."[47]  This divergence from typical Utah real estate business practices coupled with Hole No. 4's unilateral ability to defeat the purpose of the contract (and the Goodwins' justified expectations) rings of substantive unconscionability.

Concerns of procedural unconscionability arise where the manner of the contract leaves the complaining party no meaningful choice.[48]  This can occur if there is a gross inequality of bargaining power or if the terms of the contract are hidden by deceptive sales practices.[49]  This includes instances where printed forms are used that were "drawn skillfully be the party in the

---

[46] *U.S. Gen., Inc. v. Jenson*, 2005 UT App 497, ¶ 18, 128 P.3d 56, 60.

[47] *Id.* ¶ 17.

[48] *Resource Mgmt Co.*, 706 P.2d at 1042.

[49] *Id.*

strongest economic position."[50]  In this case, the REPC contained bold face font at the top indicating the form was required by Utah law.  But in reality, Hole No. 4 and Prudential allegedly altered the Utah form to benefit themselves at the expense of the Goodwins.  Additionally, the letter accompanying the REPC indicated that if the Goodwins returned the REPC within seven days, the Goodwins would "lock in" the price of unit 12.  This may reasonably be seen as a deceptive sales practice, meant to hide the rights-limiting language of paragraph 16.  With these allegations, the Goodwins have stated a claim of unconscionable business practices sufficient to withstand Hole No. 4's and Prudential's motions to dismiss.

Prudential's argument — that the Goodwins' failure to designate which of the provisions of the UCSPA Prudential violated is fatal to their claim — is belied by the language of the UCSPA.  Prudential points to subsection two of section 13-11-4, arguing the Goodwins were required to indicate which specific provision Prudential violated.  However, subsection two sets forth the enumerated list of violations with the caveat that the list is presented "[w]ithout limiting the scope of Subsection (1)."[51]  And subsection one applies "liberally"[52] to deceptive acts or practices occurring "before, during, or after the transaction."[53]  Further, the Utah Supreme Court has explicitly recognized the Utah Legislature's "mandate to construe the UCSPA liberally."[54]  In

---

[50] *Id.* (citation and internal quotations omitted).

[51] Utah Code Ann. § 13-11-4(2).

[52] *Id.* § 13-11-2.

[53] *Id.* § 13-11-4(1).

[54] *Wade v. Jobe*, 818 P.2d 1006, 1016 (Utah 1991).

light of this, the court cannot find the Goodwins have failed to sufficiently state a claim under the UCSPA against Prudential. As with Hole No. 4, the Goodwins have claimed Prudential engaged in unconscionable business practices — a claim sufficiently plead to survive this motion to dismiss.

      (F)      *Declaratory Relief*

In addition to their other claims, the Goodwins request a declaration from the court concerning Hole No. 4's future rights and obligations under the REPC and Hole No. 4's ability to deprive the Goodwins of remedies at law. The Goodwins also ask for attorneys' fees and costs pursuant to the REPC. Because the court finds an actual, justiciable controversy has arisen between Hole No. 4 and the Goodwins, the court does not dismiss the Goodwins' request for declaratory relief.

**II.**      **Prudential's Motion for a More Definite Statement**

In a separate motion, Prudential seeks an order requiring the Goodwins to issue a more definite statement with respect to their fourth and fifth causes of action — the claims of negligent misrepresentation and breach of the UCSPA. The court denies Prudential's 12(e) motion. The court will grant a motion for a more definite statement only where the complaint "is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading."[55]

In its motion for a more definite statement, Prudential claims that without a more definite statement, "it is impossible for Prudential to form an intelligent response to Plaintiff's

---

[55] Fed. R. Civ. P. 12(e).

accusations."[56] While perhaps they could have been more artfully pled, the Goodwins' fourth and fifth causes of action are detailed enough that a responsive pleading is possible. The court, therefore, denies Prudential's motion for a more definite statement.

## CONCLUSION

In sum, it is beyond doubt that the Goodwins can prove no set of facts entitling them to relief only with regard to their claim of misrepresentation against Hole No. 4. The court, therefore, GRANTS Hole No. 4's motion to dismiss [# 7] with regard to the Goodwins' claim of misrepresentation, but DENIES it with regard to the remainder of the Goodwins' claims. Additionally, the court DENIES Prudential's motion for a more definite statement [#10] and DENIES Prudential's motion to dismiss [#11].

SO ORDERED.

DATED this 15 day of November, 2006.

BY THE COURT:

_____
Paul G. Cassell
United States District Judge

---

[56]Def. Prudential's Mot. & Mem. for More Definite Statement 2, Docket No. 10.