IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| LES GOODWIN and MARY LOU GOODWIN,<br><br>　　　Plaintiffs,<br><br><br><br><br><br><br>　　　vs.<br><br><br>HOLE NO. 4, LLC; PRUDENTIAL UTAH REAL ESTATE<br><br>　　　Defendants. | ORDER DENYING THE GOODWINS' MOTION FOR SUMMARY JUDGMENT, AND GRANTING HOLE NO. 4'S CROSS-MOTION FOR SUMMARY JUDGMENT AND MOTIONS TO STRIKE<br><br><br><br><br><br>Case No. 2:06-cv-00679 |

　　　The plaintiffs in this case, Les Goodwin and Mary Lou Goodwin, have filed various claims against the defendant, Hole No. 4, LLC, relating to a residential real estate sales transaction.  Specifically, the Goodwins allege Hole No. 4 breached a real estate purchase contract and the implied covenant of good faith and fair dealing, and violated the Utah Consumer Sales Practices Act.[1]  The Goodwins have asked for damages and for declaratory relief.

　　　More recently, the Goodwins have moved for summary judgment on their breach of

---

[1] Utah Code Ann. §§ 13-11-1 *et seq.*

contract claim.  In response, Hole No. 4 has filed a cross-motion for summary judgment.  The court finds a hearing on these motions to be unnecessary and concludes it must grant summary judgment to Hole No. 4.  In short, the undisputed facts fail to support the Goodwins' claim that ambiguity exists in the contract.  Instead, it appears the Goodwins received exactly what they contracted for — their intentions and expectations were fulfilled.  In light of this, as a matter of law, the court finds Hole No. 4 did not breach the contract.  The Goodwins' other claims fail on similar grounds.

## <u>BACKGROUND</u>

When considering a motion for summary judgment, the court views the evidence in the light most favorable to the nonmoving party.[2]  When a case involves cross-motions for summary judgment, the court "'construe[s] all inferences in favor of the party against whom the motion under consideration is made.'"[3]  For the purpose of resolving these competing motions, the court finds the following facts.

Hole No. 4 is the developer of Turnberry Woods, a forty-acre, planned, single-family development along the fourth hole of the Homestead Golf Course in Midway, Utah.  The development consists of about forty homes.  Prudential is a real estate firm that represented Hole No. 4 in the marketing and brokering of the Turnberry Woods units.  Prudential has been dismissed as a party to this action.

---

[2] *See Cortez v. McCauley*, 438 F.3d 980, 988 (10th Cir. 2006).

[3] *Am. Inv. Fin. v. United States*, 364 F. Supp. 2d 1321, 1323 (D. Utah 2005) (quoting *Pirkheim v. First UNUM Life Ins.*, 229 F.3d 1008, 1010 (10th Cir. 2000)).

In October 2004, Hole No. 4 and the Goodwins entered into an agreement related to the purchase of one of the homes in Turnberry Woods.  Pursuant to this agreement, the Goodwins deposited $5,000 in earnest money to reserve the opportunity to buy a unit within Turnberry Woods.  This agreement was non-binding and contained language indicating it later would be superceded and replaced by a Real Estate Purchase Contract (REPC).  The $5000 deposit was held in the non-interest-bearing trust account of the Goodwins' agent, Mark Seltenrich.  Pursuant to the reservation agreement, the money would either become part of the Goodwins' earnest money (if they executed a REPC), or it would be returned to the Goodwins.

When the time to execute purchase contracts arrived, Hole No. 4 faced uncertainty as to the final cost of the preconstruction and infrastructure work.  Because Turnberry Woods was located on a hillside, Hole No. 4 had difficulty estimating certain costs and could not obtain firm bids from site contractors.  Therefore, Hole No. 4 wanted purchase contracts that fixed buyer remedies in case the contract price fell short of actual costs.  Prudential drafted the REPCs with this awareness that Hole No. 4 may need to default in mind.  Ultimately, it included a default provision limiting the buyers' legal remedies in the event of seller default.  Specifically, this provision stated:

> If Buyer defaults, Seller may elect either to retain the Earnest Money Deposit(s) and Options & Extras Deposits, if any, as liquidated damages, or to return the Earnest Money Deposits and Options & Extras Deposits, if any, and sue Buyer to specifically enforce this Contract, or pursue other remedies available at law.  If Seller defaults, Buyer agrees that Buyer's sole and exclusive remedy shall be to receive a return of Buyer's Earnest Money Deposits, the Options & Extras Deposit(s), if any, plus 10% interest thereon from the date of original deposit with Seller.[4]

---

[4] David Dowie Aff. ¶ 5 (Docket No. 51, Exh. 4).

In addition to the default provision of the REPC, other provisions cautioned the buyers that Hole No. 4 could terminate the sale, resulting in a refund to the buyers of the earnest money. For instance, paragraph 8.3 of the REPC references paragraph 16, indicating that Hole No. 4 might not close the transaction and clarifying that the buyers' earnest money deposit is nonrefundable unless this occurs.  Addendum No. 1 to the Goodwins' contract also indicates the deposit is nonrefundable "unless Seller fails to close the transaction in accordance with the terms of this contract."[5]

In March 2005, Prudential drafted and sent a letter, along with a partially completed REPC, to Mr. Seltenrich. The Prudential letter basically explained that the Goodwins would have the chance to lock a price of $395,000 for unit 12 by executing the included REPC.  The partially completed REPC contained, as paragraph 16, the default language quoted above.  On about April 4, 2005, Mr. Seltenrich sent the documents from Prudential to the Goodwins, accompanied by a cover letter explaining the terms of the REPC.  Mr. Seltenrich's letter explained to the Goodwins that "signing the REPC at this point just insures that you maintain your reservation and your final decision whether to go forward or not won't occur for a bit of time after that."[6]

Although the Goodwins claim they believed the REPC to be the form real estate purchase agreement approved by the State of Utah, the Goodwins admit they have never seen the state-approved form and do not know what remedies it affords.  In his letter, Mr. Seltenrich summarized the terms of the REPC and indicated that sections 10 through 23 had been modified

---

[5] REPC Addendum No. 1 (Docket No. 51, Exh. 7).

[6] Seltenrich Letter (Docket No. 51, Exh. 5).

somewhat for the project.  Mr. Seltenrich advised the Goodwins to "[r]ead through these sections

and see if you have any questions."[7]  Mr. Seltenrich further recommended that the Goodwins

"read through the entire contract and make sure you understand what is there."[8]  Then, in a later

telephone conversation, Mr. Seltenrich explained all of the REPC's provisions to the Goodwins.

The parties executed the REPC with regard to unit 12 of Turnberry Woods in May 2005.

According to its terms, May 9, 2005, became the "acceptance date" under the REPC.  The REPC

was accepted, as written, save one hand-written change initialed by the parties, altering the

evaluations and inspections deadline from 10 to 21 days after the acceptance date.  The REPC

outlined detailed processes for Hole No. 4 and the Goodwins to formally agree on the final plans

and specifications for unit 12.  And the REPC provided that it (with its addenda and exhibits)

"constitutes the entire Contract between the parties and supersedes and replaces any and all prior

negotiations, representations, warranties, understandings, or contracts between the parties."[9]

Pursuant to the REPC, the Goodwins made an additional earnest money deposit of $20,000 (for a

total earnest money deposit of $25,000).

At one point, the Goodwins visited Utah to complete a site inspection.  During this visit,

the Goodwins met with Dawn Keil, an interior designer retained by Hole No. 4.  Ms. Keil and the

Goodwins did not discuss the terms of the REPC at their meeting.  Indeed, the Goodwins' whole

understanding of the terms of the REPC came from their own reading of it and from Mr.

---

[7] *Id.*

[8] *Id.*

[9] REPC ¶ 14 (Docket No. 51, Exh. 7)

Seltenrich.  The Goodwins never spoke with any representatives of Hole No. 4 regarding the terms of the REPC.  The terms of the REPC required the Goodwins to have a preconstruction meeting with Hole No. 4 by July 8, 2005.  For disputed yet immaterial reasons, this meeting never occurred.

After Hole No. 4 began site work on unit 12, but before actually beginning vertical construction of the residence, Hole No. 4 determined the total cost of unit 12 would far exceed the contract price.  So rather than selling the unit to the Goodwins at a loss, Hole No. 4 chose to terminate the sale and to provide the Goodwins with the default remedy provided for in paragraph 16.

In a letter dated October 6, 2005, Hole No. 4 informed the Goodwins it would not sell unit 12 to them.  Pursuant to paragraph 16 of the REPC, Hole No. 4 enclosed a check for $25,876.36, declared itself to be in default, and asserted that the Goodwins had no remedy available to them other than to accept the deposit plus interest.  David Dowie, the manager of a company that is a managing member of Hole No. 4, delivered this letter by hand to Mr. Seltenrich.  He also explained to Mr. Seltenrich the economic factors leading to Hole No. 4's decision not to sell unit 12 to the Goodwins.

To date, the Goodwins have refused to negotiate Hole No. 4's check.  In their suit, the Goodwins claim they did not understand paragraph 16 to limit their remedy of specific performance in the event of an intentional default by Hole No. 4.  But the undisputed facts contradict this claim.  For instance, in their interrogatory answers, the Goodwins indicate they did not "recall having a specific understanding of the meaning of paragraph 16 at the time they

signed the REPC."[10]  And in his deposition, Les Goodwin testified that he understood paragraph 16 to mean "[i]f the seller defaults, he's going to give us our money back with ten percent" as their sole and exclusive remedy.[11]  Moreover, Hole No. 4 indicates it had no intent to limit buyer remedies only in event of unintentional default, and the concept of unintentional default was never discussed until the Goodwins filed this suit.

Nonetheless, the Goodwins brought this action alleging breach of contract, breach of the covenant of good faith and fair dealing, negligent misrepresentation, and violation of the Utah Consumer Sales Practices Act[12] (UCSPA).  The Goodwins ask for damages and declaratory relief.  Earlier, Hole No. 4 and Prudential filed a motion to dismiss.  The court denied the motion in large part, taking the Goodwins' allegations as true.  The court dismissed only the negligent misrepresentation claim against Hole No. 4 at the motion to dismiss stage.  Then the parties stipulated to the dismissal of Prudential from the suit.  Therefore, at issue in this order are all of the remaining claims against Hole No. 4 — breach of contract, breach of the covenant of good faith and fair dealing, and violation of the UCSPA.  The Goodwins have filed a motion for summary judgment with regard to the breach of contract claim, and Hole No. 4 has responded by filing a cross-motion for summary judgment on all of the Goodwins' claims.  Hole No. 4 has also filed motions to strike portions of the Goodwins' affidavit and the affidavit of Geoffrey Munroe.

---

[10] Goodwins' Interrogatory Answer, No. 13 (Docket No. 51, Exh. 6).

[11] Goodwin Depo. 15 (Docket No. 51, Exh. 3).

[12] Utah Code Ann. §§ 13-11-1 *et seq.*

## <u>DISCUSSION</u>

I.    **Motions to Strike**

Hole No. 4 has filed motions to strike portions of the affidavits of the Goodwins and Geoffrey Munroe, claiming they fail to meet evidentiary standards.  The court grants these motions.

To oppose a motion for summary judgment, the non-moving party must "go beyond the pleadings and 'set forth specific facts' that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[13]  Effectively, this means evidence inadmissible under the Federal Rules of Evidence is inadmissible at the summary judgment stage.  Under this standard, Hole No. 4 alleges some of the Goodwins' evidence is inadmissible under Rule 801 and Rule 408.

With regard to the Goodwins' affidavits, Hole No. 4 has asked the court to strike the out-of-court statements allegedly made to the Goodwins by Ms. Keil, the interior designer retained by Hole No. 4.  The first challenged statement appears in paragraph 10: "Ms. Keil also asked it if were all right if the construction on our unit would not begin until the second phase of the development, which would not be for several months.  We said that was fine with us."[14]  Hole No. 4 also challenges the letter the Goodwins refer to and attach as an exhibit.  The Goodwins claim the statements are not offered for the truth of the matter asserted, but fail to indicate what alternative purpose the statements and letter serve.  The court finds that both the statements in

---

[13] *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998).

[14] Goodwin Aff. ¶ 10 (Docket No. 43).

paragraphs 10 and 11, as well as the letter itself, constitute inadmissible hearsay under Rule 801.[15]  The Goodwins also claim the statements qualify as admissions by a party opponent because Ms. Keil was an independent contractor of Hole No. 4.  This claim fails to save the statement because Ms. Keil is not a party, and there is no evidence she had authority to make statements on Hole No. 4's behalf or that the scope of her agency covered the statements.  For all these reasons, the court grants Hole No. 4's motion to strike these paragraphs and the letter.

Hole No. 4 also challenges the admissibility of Geoffrey Munroe's affidavit.  Hole No. 4 contends the affidavit includes letters between counsel that are protected by Rule 408.[16]  Rule 408 provides that statements made in compromise negotiation are inadmissible to prove "liability for, invalidity of, or amount of a claim."[17]  This rule is meant to encourage and protect settlement discussions.  The mediation statement and the letters attached to Mr. Munroe's affidavit fall within the purview of Rule 408 because they were made in settlement negotiations — one even outlines the parties' settlement history.  Paragraphs 2 and 3 of the affidavit are similarly sensitive.  The Goodwins argue the letters and paragraphs are not offered to prove the liability of Hole No. 4, but are simply offered in support of specific facts.  But this argument holds no weight — the facts are what make the case and, in their case, the Goodwins claim Hole No. 4 is liable.  At one point, the Goodwins also claim the facts established by the letters appended to Mr. Munroe's affidavit are not in dispute.  If true, the court fails to see the purpose of including the

---

[15] Fed. R. Evid. 801.

[16] Fed. R. Evid. 408.

[17] *Id.*

letters and sensitive paragraphs.  The court, therefore, finds it necessary to strike paragraphs 2 and 3 of Mr. Munroe's affidavit, as well as the accompanying letters.

Finally, it is important to note that even if the court considered the stricken statements and documents, it would not change the outcome of this order.  The relevance of the statements and documents is questionable, and none of them affect the key inquiry — the intent of the contracting parties.

## II.    Motions for Summary Judgment

The Goodwins seek summary judgment on their breach of contract claim, and Hole No. 4 seeks summary judgment on all of the Goodwins' claims.  Because the intent of parties regarding the REPC is clear from the evidence, and the facts do not establish bad faith, deceptive acts, or unconscionability, the court must grant summary judgment to Hole No. 4.

### (A)    Standard of Review

The court should grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."[18]  In determining the appropriateness of summary judgment, the court must "view the evidence, and draw reasonable inferences therefrom, in the light most favorable to the nonmoving party."[19]  When a case involves cross-motions for summary judgment, the court "'construe[s] all inferences in favor of the party against whom the motion under consideration is

---

[18] Fed. R. Civ. P. 56(c).

[19] *Combs v. PriceWaterhouse Coopers, LLP*, 382 F.3d 1196, 1199 (10th Cir. 2004).

made.'"[20]   However, "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [party]."[21]

> (B)      *Breach of Contract Claim*

In their complaint, the Goodwins allege Hole No. 4 breached the REPC by anticipatorily repudiating it.  The Goodwins ask for summary judgment on this claim.  In response to the Goodwins' motion, Hole No. 4 admits it defaulted on the contract, but contends the Goodwins' claim fails nonetheless because the Goodwins received exactly what they bargained for in the event of a default — the return of their deposits, plus interest.  Because the undisputed facts support Hole No. 4's contention, the court must grants summary judgment to Hole No. 4 on the breach of contract claim.

In its order on the motion to dismiss, the court took the Goodwins' well-plead allegations as true, as it was required to do.  This gave the Goodwins the opportunity to prove a set of facts that may entitle them to relief.  But rather than producing evidence to support their allegations, the Goodwins rely primarily on the fact that they prevailed at the motion-to-dismiss stage to support their arguments at the summary judgment stage.  But the standard of review at the summary judgment stage is different, as are the evidentiary requirements.  And the Goodwins have produced no evidence to support their claims about the parties' intentions with regard to

---

[20] *Am. Inv. Fin. v. United States*, 364 F. Supp. 2d 1321, 1323 (D. Utah 2005) (quoting *Pirkheim v. First UNUM Life Ins.*, 229 F.3d 1008, 1010 (10th Cir. 2000)).

[21] *Anderson v. Liberty Lobby*, 477 U.S. 242, 252 (1986).

paragraph 16 and the REPC as a whole.  Hole No. 4, on the other hand, has produced significant

evidence supporting its claims.  In other words, the Goodwins have wholly failed to meet their

burden.

In contract interpretation, the underlying purpose is to "ascertain the intentions of the

parties to the contract."[22]  To that end, the court looks to the writing itself, and views all the

provisions in the contract as a whole, "with a view toward giving effect to all and ignoring

none."[23]  If the court concludes ambiguity exists and there is a factual issues as to the parties'

intentions, the court must deny the motion for summary judgment.[24]  But if the contract language

is not ambiguous, "the parties' intentions are determined from the plain meaning of the

contractual language, and the contract may be interpreted as a matter of law."[25]  To determine if

language is ambiguous, the court must consider all relevant evidence.[26]

In this case, the language of the contract is clear and unambiguous on its face and it

specifically limits the Goodwins' remedies in the event of any type of default by Hole No. 4.  To

begin with, paragraph 16, entitled "Default" states: "If Seller defaults, Buyer agrees that Buyer's

sole and exclusive remedy shall be to receive a return of Buyer's Earnest Money Deposits, the

Options & Extras Deposit(s), if any, plus 10% interest thereon from the date of original deposit

---

[22] *Green River Canal Co. v. Thayn*, 2003 UT 50, ¶ 17, 84 P.3d 1134, 1141 (citation and
internal quotations omitted).

[23] *Id.* (citation and internal quotations omitted).

[24] *Id.*

[25] *Id.*

[26] *Novell, Inc. v. Canopy Group, Inc.*, 2004 UT App 162, ¶ 21, 92 P.3d 768, 774.

with Seller."[27]  In addition to this default provision, other portions of the REPC caution the

Goodwins that Hole No. 4 could terminate the sale, resulting in a refund of the Goodwins'

earnest money.  For instance, paragraph 8.3 refers to paragraph 16 and clarifies that the

Goodwins' earnest money deposit is nonrefundable unless Hole No. 4 closes the transaction.

Addendum No. 1 also indicates that the Goodwins' deposit is nonrefundable "unless Seller fails

to close the transaction in accordance with the terms of this contract."[28]  In short, the contract as a

whole consistently and unambiguously refers to the Goodwins' limited remedies in the event of

any default by Hole No. 4.  This finding of unambiguity is consistent with those of other

jurisdictions.[29]

The Goodwins claim some ambiguity exists relating to whether paragraph 16 applies only

to unintentional defaults or to all defaults by Hole No. 4.  But the concept of intentional versus

unintentional defaults appears nowhere in the REPC and the parties never discussed it until after

this suit began.  If the parties had meant paragraph 16 to apply only to unintentional defaults,

they easily could have (and would have) indicated as much.  If paragraph 16 only applied to

unintentional defaults, it is also likely the parties would have defined the term "unintentional."

Because the parties did not parse the concepts and because the extrinsic evidence does not

support a finding that the parties meant to do so, the court finds that paragraph 16 applies to all

---

[27] REPC ¶ 16 (Docket No. 51, Exh. 7).

[28] REPC Addendum No. 1 (Docket No. 51, Exh. 7).

[29] *See, e.g., Doyle v. Ortega*, 872 P.2d 721, 724 (Idaho 1994) (finding similar contract language to be unambiguous); *Washburn v. Ronald W. Thomas & Raymond Wayne Thomas Charitable Remainder Annuity Trust*, 37 P.3d 465, 467–68 (Colo. Ct. App. 2001) (same).

defaults.  Additionally, if paragraph 16 were limited to unintentional defaults, the parties would apparently be left with no defined remedy for intentional defaults — an unlikely result.

Applying paragraph 16 to all defaults is not only consistent with the plain language of the contract, it is consistent with the parties' intent, as revealed through extrinsic evidence.  Before drafting the REPC, Hole No. 4 faced uncertainty as to the final cost of the preconstruction and infrastructure work of its units.  Turnberry Woods is located on a hillside, so Hole No. 4 had difficulty estimating certain costs and obtaining firm bids.  Therefore, it was Hole No. 4's specific intent to use paragraph 16 to fix buyer remedies in case the contract price fell short of the actual cost.  In other words, Hole No. 4 was aware it may need to default on the contracts and it wished to protect itself by limiting buyer remedies in the event of its intentional default.  Other than in their legal arguments to this court, the Goodwins have never claimed the provision was to apply only to unintentional defaults.  The evidence shows the Goodwins indicated only that they did not "recall having a specific understanding of the meaning of paragraph 16 at the time they signed the REPC."[30]  And in his testimony, Les Goodwin confirmed the "unintentional default" interpretation was not intended at the time the parties entered the REPC:

> Q.   Do you understand want that sentence [in paragraph 16] says?
> A.   I understand what it says here, yes.
> Q.   What does it mean to you?
> A.   If the seller defaults, he is going to give us our money back with ten percent.
> Q.   Is that your sole and exclusive remedy?
> A.   That is what I think.[31]

---

[30] Goodwins' Interrogatory Answer, No. 13 (Docket No. 51, Exh. 6).

[31] Goodwin Depo. 50 (Docket No. 51, Exh. 3).

Nowhere in their depositions, affidavit, or in response to Hole No. 4's discovery requests did the Goodwins' mention *unintentional* defaults.  In light of this evidence, an interpretation limiting paragraph 16 only to unintentional defaults is simply not tenable.  If the concept of unintentional defaults truly comported with their intent, the Goodwins would have at least mentioned it.  In other words, the evidence establishes that Goodwins fully understood paragraph 16 to limit their remedies to a return of their earnest money plus 10 percent interest and intended it to do so.  This term is clear both from the face of the contract and from the extrinsic evidence.

The Goodwins argue that in one line of his deposition, Mr. Goodwin did express his understanding of paragraph 16 as applying only to unintentional defaults.  But this is not a reasonable interpretation of the testimony to which the Goodwins cite.  After the interviewer asked Mr. Goodwin if he understood what the last sentence of paragraph 16 means, Mr. Goodwin responded,

> A.   Yes.
> Q.   What does it mean?
> A.   Failed to close, can't build the house.[32]

It is simply not reasonable to think this one line by Mr. Goodwin represents his understanding that paragraph 16 is limited to unintentional defaults.  Mr. Goodwin never mentions unintentional defaults, and his statement could easily apply to all types of defaults.  The fact that this statement is the best evidence the Goodwins cite in support of their claimed understanding and intentions shows the weakness of their argument.

The Goodwins also argue that only Hole No. 4's secret intent supports application of

---

[32] *Id.* at 52.

paragraph 16 to all defaults, not the parties' joint manifest intent.  But "[m]anifest intent can be shown by the express words of the parties or . . . the facts and circumstances attending the transaction."[33]  Not only does Mr. Goodwin's express understanding fit with Hole No. 4's intentions regarding the provision, but the circumstances also support the Goodwins' intent to limit their remedies.  Mr. Seltenrich explained all of the REPC's provisions to the Goodwins and specifically flagged the modified provisions for their careful review.  The Goodwins engaged in arms-length negotiations with Hole No. 4 — each party was represented by an agent.  And the Goodwins were free to try to negotiate different terms.  Indeed, the Goodwins successfully negotiated a later date to complete their evaluations and inspections.  The Goodwins' awareness of the modified provision, coupled with their express understanding of it, and their acceptance of the contract terms shows applying paragraph 16 to all defaults fits with the parties' manifest intent, not just the secret intent of Hole No. 4.

The letter from Prudential, indicating the Goodwins would have the opportunity to lock in the price of $395,000 for unit 12, fails to create any ambiguity in paragraph 16 or the REPC as a whole.  First, this letter does not give the Goodwins the right to disregard the clear terms of the REPC.  Additionally, paragraph 14 of the REPC provides for the REPC to supercede and replace all previous representations and negotiations between the parties, and the REPC was executed after the letter was sent.  According to the REPC, both the Goodwins and Hole No. 4 could cancel the sale at different points in the process, so the "lock in" language of the Prudential letter

---

[33] *Ford v. Am. Express Fin. Advisors, Inc.*, 2004 UT 70, ¶ 23, 98 P.3d 15, 22 (citation and internal quotations omitted).

did not create some kind of unqualified right.

The Goodwins also object to the termination rights paragraph 16 allegedly gives to Hole No. 4. The court recognizes that Utah "courts endeavor to construe contracts so as not to grant one of the parties an absolute and arbitrary right to terminate a contract."[34] But here, the Goodwins' evidence does not support a finding that paragraph 16 gave Hole No. 4 an absolute or arbitrary right to terminate. For one thing, Hole No. 4 could not terminate unless it refunded the Goodwins' earnest money plus ten percent interest. For another thing, the Goodwins' duty to buy the unit was contingent on their ability to get financing and their approval of Hole No. 4's disclosures. In other words, under certain circumstances, the Goodwins could have terminated the contract also. Because the Goodwins had the right, under certain circumstances, to cancel the sale under the REPC, the REPC cannot be seen as an option contract in favor of Hole No. 4 or as granting Hole No. 4 an unqualified right to terminate. And even an option contract in favor of Hole No. 4 would be enforceable as long as that is what the parties bargained for and intended.[35]

Finally, in their opposition to Hole No. 4's cross-motion for summary judgment, the Goodwins raise an entirely new argument. They assert that paragraph 16 may constitute an unenforceable liquidated damages provisions. In the first instance, the court will not consider new arguments at the summary judgment stage.[36] Second, even if the court were to consider the argument, it would fail. As with their other claims, the Goodwins offer no evidence to support

---

[34] *Pierce v. Pierce*, 2000 UT 7, ¶ 19, 994 P.2d 193, 198 (citation and internal quotations omitted).

[35] *See U.S. Gen., Inc. v. Jenson*, 2005 UT App 497, ¶¶ 12–19, 128 P.3d 56, 59–61.

[36] *See Lawmaster v. Ward*, 125 F.3d 1341, 1346 n.2 (10th Cir. 1997).

that paragraph 16 qualifies as a liquidated damages provision.  Paragraph 16 does not set an immovable damages figure in advance if a party breaches, it simply provides for the return of the earnest money plus interest if Hole No. 4 defaults.  By complying with this provision, Hole No. 4 has not breached the contract.

In sum, in light of the evidence, it would be unreasonable to read the contract as including any kind of an implied term — none is necessary to preserve the intent of the parties.  If there is any doubt about a contract's interpretation, courts prefer interpretations leading to "fair and equitable" results over "harsh and unreasonable" results.[37]   But Hole No. 4 has shown there is no doubt about the interpretation of the REPC.  The key inquiry is the parties' intent at the time of contracting, and the evidence shows the intent was to limit the Goodwins' remedies in the event of Hole No. 4's default — intentional or unintentional.  In other words, the Goodwins have failed to establish any ambiguity in the contract or to establish that the intent of the parties was to limit the Goodwins' remedies only in the event of unintentional default.  As Hole No. 4 fulfilled its obligations under the REPC, the Goodwins are entitled to no specific performance or damages under this claim.  The Goodwins received what they bargained for under the REPC as a matter of law, and the court must grant summary judgment to Hole No. 4 on the anticipatory repudiation/breach of contract claim.

### (C)        Breach of Implied Covenant of Good Faith and Fair Dealing Claim

The Goodwins also claim Hole No. 4 breached the  implied covenant of good faith and fair dealing.  As with the breach of contract claim, the Goodwins have not established Hole No. 4

---

[37] *Pierce*, 2000 UT 7, ¶ 19.

violated its implied covenant of good faith and fair dealing.

Under Utah law, "the implied covenant of good faith and fair dealing inheres in most, if not all, contractual relationships."[38]  "[A]n implied covenant of good faith forbids arbitrary action by one party that disadvantages the other."[39]  But this doctrine is limited:

> First, this covenant cannot be read to establish new, independent rights or duties to which the parties did not agree ex ante.  Second, this covenant cannot create rights and duties inconsistent with express contractual terms.  Third, this covenant cannot compel a contractual party to exercise a contractual right to its own detriment for the purpose of benefitting another party to the contract.  Finally, we will not use this covenant to achieve an outcome in harmony with the court's sense of justice but inconsistent with the express terms of the applicable contract.[40]

Additionally, the parties' common purpose and justified expectations are critical in deciding whether a party breached the implied covenant of good faith and fair dealing.[41]

> An examination of express contract terms alone is insufficient to determine whether there has been a breach of the implied covenant of good faith and fair dealing.  To comply with his obligation to perform a contract in good faith, *a party's actions must be consistent with the agreed common purpose and the justified expectations of the other party.*  The purpose, intentions, and expectations of the parties should be determined by considering *the contract language and the course of dealings between and conduct of the parties.*[42]

As discussed before, Hole No. 4 has established that while the REPC existed mainly for

---

[38] *A.I. Transp. v. Imperial Premium Fin.*, 862 F. Supp. 345, 348 (D. Utah 1994).

[39] *Resource Mgmt Co. v. Weston Ranch & Livestock Co.*, 706 P.2d , 1028, 1037 (Utah 1985).

[40] *Oakwood Vill. L.L.C. v. Albertsons, Inc.*, 2004 UT 101, ¶ 45, 104 P.3d 1226, 1240.

[41] *A.I. Transp.*, 862 F. Supp. at 348.

[42] *St. Benedict's Devel. Co. v. St. Benedict's Hospital*, 811 P.2d 194, 200 (Utah 1991) (emphasis added) (citations omitted).

the agreed common purpose of exchanging real estate for money, the parties also bargained for the limitation of the Goodwins' remedies in the event of Hole No. 4's default.  In light of this, it would be unjustified for the Goodwins to expect more than the remedy provided for in paragraph 16 — the return of their earnest money plus ten percent.  The parties contracted specifically for the purpose of allowing Hole No. 4 to use paragraph 16 as an escape valve.  Therefore, only this interpretation meets the terms of the contract and the expectations of the parties.  Further, Hole No. 4 has established it acted consistently with the contract and the parties' intentions by paying under the default provision.

In sum, the Goodwins' failure to prove an intent to limit their remedies only in the event of unintentional defaults is fatal to this claim as well.  No reasonable trier of fact could find otherwise, so the court must grant summary judgment to Hole No. 4 on this claim.

(D)     *Utah Consumer Sales Practices Act Claim*

The Goodwins also mount a claim against Hole No. 4 under the UCSPA.  The court finds the Goodwins' claims under the UCSPA fail because the Goodwins have failed to establish by evidence that the REPC is unconscionable or that Hole No. 4 engaged in a deceptive act or practice.

The UCSPA prohibits a "supplier" from "knowingly or intentionally" committing a deceptive or unconscionable act or practice in connection with a "consumer transaction."[43] Section 13-11-4 of Utah's code sets forth numerous practices of deception and acts prohibited under the UCSPA.  The Goodwins' claim under the UCSPA is weak at the outset, as the

---

[43] *See* Utah Code Ann. §§ 13-11-4, -5.

Goodwins fail to specify which of the enumerated acts Hole No. 4 allegedly committed.  The court addresses the UCSPA under the unconscionability provision, as this is where the Goodwins seem to focus their arguments.

The question of whether a contract is unconscionable is for the court to determine as a question of law.[44]  A contract clause may be unconscionable if it is substantively unconscionable, procedurally unconscionable, or both.[45]  The focus of substantive unconscionability is the fairness of each party's obligations.[46]  Substantive unconscionability is assessed "in light of the general commercial background" and "according to the mores and business practices of the time and place."[47]  But, "[e]ven if a contract term is unreasonable or more advantageous to one party, the contract, without more, is not unconscionable — the terms must be so one-sided as to oppress an innocent party."[48]  The situation must be conscience-shocking or "one in which no decent, fair-minded person would view the results without being possessed of a profound sense of injustice."[49]

> A party claiming unconscionability bears a heavy burden.  This is because with a few exceptions, it is still axiomatic in contract law that persons dealing at arm's length are entitled to contract on their own terms without the intervention of the

---

[44] *Sosa v. Paulos*, 924 P.2d 357, 360 (Utah 1996).

[45] *Resource Mgmt Co.*, 706 P.2d at 1043.

[46] *Id.* at 1041.

[47] *Id.* at 1042 (citations and internal quotations omitted).

[48] *Ryan v. Dan's Food Stores, Inc.*, 972 P.2d 395, 402 (Utah 1998) (citation and internal quotations omitted).

[49] *Woodhaven Apartments v. Washington*, 942 P.2d 918, 925 (Utah 1997).

courts for the purpose of relieving one side or the other from the effects of a bad bargain.  Courts will not assume the paternalistic role of declaring that one who has freely bound himself need not perform because the bargain is not favorable.[50]

The Goodwins have failed to meet their heavy burden to show the REPC as a whole or paragraph 16 in particular are susbstantively unconsionable.  The Goodwins only succeed in showing that they agreed to a bargain that severely limits their legal remedies while providing advantages to Hole No. 4.  This is not enough — even if the court were to find paragraph 16 to be wholly unreasonable, this would not alone establish substantively unconscionability.

Moreover, the court notes that there is no indication paragraph 16 had a harsh or unreasonable effect on the Goodwins.  First, this provision left the Goodwins with a remedy in the event of a default by Hole No. 4.  It did not leave them empty-handed.  Next, less than six months had passed between the execution of the REPC and Hole No. 4's termination of it.  During this time, the Goodwins had only flown to Utah once, and they had not sold their primary residence.  Indeed, the Goodwins had not even attended the required preconstruction meeting.  The Goodwins may wish they entered a different contract, but courts may "not make a better contract for the parties than they have made for themselves."[51]  The Goodwins could have bargained for a different remedies provision but, instead, they agreed to the provision as written.

The Goodwins argue that paragraph 16 violates the UCSPA because it allows Hole No. 4 to pick its deal.  In other words, if a unit turns out to be worth more than the agreed upon price,

---

[50] *Cantamar, L.L.C. v. Champagne*, 2006 UT App 321, ¶ 26, 142 P.3d 140, 150 (citations and internal quotations omitted).

[51] *Bakowski v. Mountain States Steel, Inc.*, 2002 UT 62, ¶ 19, 52 P.3d 1179, 1185.

Hole No. 4 can return the deposit and benefit from the appreciation of the property. But if the unit is worth less than the agreed upon price, Hole No. 4 can bind the buyers to the deal, forcing them to bear the loss from the depreciation. But this argument is inapposite if only because there is no evidence this occurred. The Goodwins have presented no evidence Hole No. 4 ever relied on paragraph 16 to take advantage of appreciated property in the Goodwins' transaction or any other transaction in Turnberry Woods. Rather, the evidence shows Hole No. 4 simply used the provision to protect itself from significant and unpredictable cost increases. Because there is no evidence Hole No. 4 actually used paragraph 16 to take advantage of any party, the Goodwins' argument fails to support any inference of bad faith.

Additionally, the Goodwins point out that paragraph 16 appears to differ greatly from Utah state-sanctioned real estate purchase contracts with regard to buyer remedies.[52] In some circumstances, this may be a reason to pause, but the evidence in this case shows that the only reason the form diverged from usual Utah real estate business practices was because the Goodwins knowingly agreed to the divergence. The Goodwins' agent, Mr. Seltenrich, notified the Goodwins that the REPC differed from the state-sanctioned form and advised them to carefully review the modified provisions of the contract (which included paragraph 16). Mr. Seltenrich also summarized the meaning of each of the provisions for the Goodwins. The Goodwins had time to review the REPC and executed it only when they so desired. They also had a number of weeks in which to cancel the REPC before their earnest money became non-refundable. Further, the Goodwins could have requested modifications to the REPC. In fact,

---

[52] *See Jenson*, 2005 UT App 497, ¶ 18.

they did negotiate a date change.  In other words, there is no reason to think the Goodwins were

bound by any provisions with which they disagreed.  In light of these facts, no substantive

unconscionability arises from the modifications.

With regard to procedural unconscionability, concerns arise where the manner of the

contract leaves the complaining party no meaningful choice.[53]  The relevant factors the court

assesses are:

> (1) whether each party had a reasonable opportunity to understand the terms and
> conditions of the agreement; (2) whether there was a lack of opportunity for
> meaningful negotiation; (3) whether the agreement was printed on a duplicate or
> boilerplate form drafted solely by the party in the strongest bargaining position;
> (4) whether the terms of the agreement were explained to the weaker party; (5)
> whether the aggrieved party had a meaningful choice or instead felt compelled to
> accept the terms of the agreement; and (6) whether the stronger party employed
> deceptive practices to obscure key contractual provisions.[54]

Importantly, Utah code mandates that the "court shall consider circumstances which the supplier

knew or had reason to know" when determining if an act or practice is unconscionable.[55]

The Goodwins' strongest argument in favor of procedural unconscionability is that

although the REPC was not the state-sanctioned form, bold face type at the top of the REPC

indicated the form was required by Utah law.  In the abstract, this could support an argument that

the Goodwins had no reasonable opportunity to understand the terms, or that Hole No. 4

employed deceptive practices to obscure key contractual provisions.  But these arguments have

no force when viewed in light of the undisputed factual circumstances.  For one thing, there is no

---

[53] *Resource Mgmt Co.*, 706 P.2d at 1042.

[54] *Ryan*, 972 P.2d at 403 (quoting *Sosa*, 924 P.2d at 362).

[55] Utah Code Ann. § 13-11-5(3).

evidence Hole No. 4 was a stronger party in the bargain.  Hole No. 4 was the developer of

Turnberry woods, but the Goodwins had representation from the real estate arena as well — Mr.

Seltenrich from Coldwell Banker.  For another thing, Mr. Seltenrich negated any effect of the

bold face type by advising the Goodwins that the REPC had been modified, flagging the specific

modified provisions for them (including paragraph 16), and recommending they read the

provisions carefully.  Indeed, Mr. Seltenrich even reviewed each of the terms of the REPC with

the Goodwins.  Considering this, it is unrealistic to consider Hole No. 4's practice as deceptive or

obscured.

     Additionally, the letter from Prudential indicating the Goodwins could "lock in" a price

of $395,000 by executing the REPC fails to rise to the level of procedural unconscionability

because there is no indication Hole No. 4 had reason to know the Goodwins were relying on the

letter to the exclusion of the REPC.  In fact, it would be unreasonable to think the Goodwins

were relying on the letter because the terms of the REPC indicated that it superceded any and all

other previous agreements.  Further, the Prudential letter does not necessarily even conflict with

the REPC.  If Hole No. 4 had not exercised its right under paragraph 16 to return the earnest

money and ten percent interest, the Goodwins could have bought unit 12 for $395,000, as stated

in the letter.

     In sum, the Goodwins' unconscionability arguments fail because the Goodwins

knowingly entered into a contract limiting their legal remedies and "[i]t is a long-standing rule in

Utah that persons dealing at arm's length are entitled to contract on their own terms without the

intervention of the courts to relieve either party from the effects of a bad bargain."[56]  Because of this, the Goodwins' UCSPA claim fails as a matter of law.

As a final note, the Goodwins have filed a motion for extension of time to complete discovery.  This was not filed as a Rule 56(f) motion or filed in opposition to Hole No. 4's cross-motion for summary judgment.  Instead, the Goodwins simply ask that they be granted additional time for discovery after the court rules on the pending motions for summary judgment.  In light of the court's ruling today, the Goodwins' motion for an extension of time is moot.

## CONCLUSION

In the end, the Goodwins request a declaration from the court concerning Hole No. 4's future rights and obligations under the REPC and Hole No. 4's ability to deprive the Goodwins of remedies at law.  Just so it is clear, the court finds Hole No. 4 fulfills its obligations under the REPC by refunding the Goodwins their earnest money deposit plus ten percent.  Beyond this, Hole No. 4 has no further obligation under the REPC and the Goodwins have no further rights under the REPC and no further remedies at law.

Because the Goodwins have flatly failed to support their claims with evidence, in addition to GRANTING Hole No. 4's motions to strike [#46, #48], the court finds it necessary to GRANT Hole No. 4's cross- motion for summary judgment [#50] and DENY the Goodwins' motion for summary judgment [#41].  In light of the court's ruling, the Goodwins' motion for an extension

---

[56] *Hal Taylor Assocs. v. Unionamerica Inc.*, 657 P.2d 743 (Utah 1982).

of discovery [#63] is MOOT.   The clerk's office is directed to enter judgment accordingly and to

close the case.

SO ORDERED.

DATED this 31st day of July, 2007.

BY THE COURT:

_____

Paul G. Cassell
United States District Judge